Hear ye, hear ye, this Honorable Appellate Court for the 2nd District is now open. The Honorable Justice Robert McLaren presiding, along with Justice Hutchinson and Justice George Bridges. The case is number 2-19-05-01. 3BC Properties, LLC, et al., Plaintiffs' Appellants v. State Farm Fire & Casualty Co., Defendant Appellee. Arguing for the Appellants, Edward J. Manske. Arguing for the Appellee, Kyle McConnell. Thank you. Mr. Manske, you may proceed. Thank you, Your Honor, and good morning, everyone. May it please the Court, my name is Edward Manske, that's spelled M-A-N-Z-K-E, and I represent the Plaintiff Appellant 3BC. We're here this morning arguing that summary judgment should not have been granted to State Farm and instead should have been granted to 3BC. In fact, based on the trial court's written order, I submit to the Court that Judge Fullerton suggests that this Court should, in fact, reverse him and grant summary judgment in favor of 3BC. The issue before this Court is very specific. Does the employee dishonesty rider cover the theft of over $66,000 from 3BC by its multi-unit manager, Brenda Vasquez? Our contention is that it clearly should cover the theft here. At the outset, I think it is important to note that when interpreting insurance policies, exclusions from coverage must be construed narrowly, and all ambiguities are to be resolved in favor of coverage. Likewise, if the terms of an insurance policy are susceptible to more than one reasonable meaning, a court should strictly construe those terms against the insurer and in favor of the insured. Now, the split among courts that have interpreted the endorsement at issue here, I believe is the best evidence that the terms of the endorsement are susceptible to more than one meaning. And therefore, this Court should strictly construe the terms of the endorsement against State Farm and in favor of its insured, 3BC. We believe the plain language of the employee dishonesty endorsement here supports coverage for the exact type of theft that Vasquez committed. The extension of coverage for theft that 3BC paid additional premiums for covers a loss of money resulting from the dishonest acts of an employee with manifest intent to obtain a financial benefit other than a legitimately earned benefit in the normal course of employment. And that's exactly what took place here. Specifically, 3BC's employee Vasquez embezzled over $66,000 by using her position to create fraudulent time records for work that was never performed. That fact is admitted and not in dispute. Vasquez did not earn a single penny of the money. She simply stole it. 3BC purchased that theft coverage specifically to protect itself from this type of dishonesty. The money Vasquez stole was not salary.  It was not a bonus. And it was not any other type of benefit that she earned in the normal course of her employment. The extension of coverage for salary, commissions, bonus, etc., we believe clearly contemplates bona fide salary disputes between employers and employees, not employee theft. The clear implication of the exclusion is that State Farm does not intend to become the arbiter or the mediator of employer-employee disputes. What little Illinois precedent there is here does not support exclusion of 3BC's loss from the theft driver. In fact, we believe what little Illinois precedent there is supports coverage in this particular case. The 2nd District Appellate Court has never had the opportunity until this case to interpret the theft rider at issue here. But it has ruled on a similar rider in Oxford Bank. The Oxford Bank Court held that dishonest activity of bank employees to obtain financial benefit via embezzlement is not a valid business activity of the bank, and therefore the embezzlement was covered. Again, this is not the exact same rider, but the reasoning applies equally to what happened here. There have only been two Illinois cases to discuss the rider at issue here, Mortell and Hartford. Both of those cases, however, are distinguished as Judge Fullerton specifically noted in his written opinion. Mortell is a 1st District case from 1983, and it involved salespeople who actually earned commissions for selling commodities, but they did so in a deceptive manner. It did not involve theft. The Mortell salespeople actually performed the work that they were paid for. Mortell also, unlike this particular case, involved in a specific exclusion to coverage, not an extension of coverage. I think it's most important to note that in Mortell, the argument made by the insurance company supports our position here. Counsel for the insurance company, it was called INA, argued in the 1st District Court noted as follows. INA asserts that by the plain language of the amendment, there must be proof of a manifest intent, first, to harm the employer, and second, to obtain financial benefit for the employee. Other than the benefits earned in the normal course of employment. That's what INA was arguing, and that is exactly what we have in the present case. Benefits, in this case money, that was not earned, but rather stolen by Vasquez. The Hartford case is a Northern District of Illinois case from 1986. It is technically not precedential, and again, is also very distinguishable. In Hartford, sales agents actually sold life insurance policies, but were financing those policies using their own commissions. The sales agents actually made the sales, they actually brought in revenue to the Hartford, and they actually received commissions for actual life insurance policies that were sold. Like Mortel, there was no theft. In contrast, Vasquez did not earn any money here. She simply stole it. We believe, again, like Mortel, that the Hartford holding supports coverage in the present case. The Hartford Court specifically noted that the phrase, quote, earned in the normal course of employment, close quote, is included to allow coverage for losses resulting from, quote, compensation schemes that are generally unearned, such as payoffs, embezzlement, and other forms of theft. That's exactly what we have here, theft, embezzlement. Now, unlike Mortel and Hartford, that only dealt with the rider that we're dealing here and not theft, we have a case that's precisely on point in Alabama, the Alabama Supreme Court opinion of Cincinnati Insurance, and it involves both the same rider and the same scheme, employee theft, to steal money not earned. There in Cincinnati, two employees developed the scheme to issue themselves payroll checks in excess of their salaries. Regarding the theft rider, the Cincinnati court found the clause as read by an ordinary person draws the distinction between employee benefits earned in the normal course of employment, which are not covered by the policy, and things such as embezzlement, kickbacks, payoffs, and general theft, which are covered. In holding that the policy covered the theft at issue, the court found first that the ambiguities in the insurance policy must be construed liberally in favor of the insured, and second, that the money received by the employees was not salaried because those funds exceeded the employees' fixed compensation and was not earned. The court noted that the insurance company wanted to interpret the rider as excluding all money designated as salary, which wasn't what the rider stated, and held that, quote, embezzled funds are not salaries, close quote. And as a result, found the policy covered the theft. Here, as Judge Fullerton noted in his opinion, the Cincinnati's court decision involved the same policy language. It is a logical decision. It is a well-reasoned decision, and the decision is consistent with Illinois policy to strictly construe terms against the insurer and in favor of the insured. The Cincinnati holding makes sense because salary, commissions, bonuses are all forms of compensation that are earned. The money Vasquez received was not earned. It was simply stolen. So State Farm can call the money stolen by Vasquez salaried, but that doesn't make it salary. It was money above and beyond her salary, and that wasn't earned. It was simply stolen. Your Honors, we submit that when an insured purchases coverage for dishonest acts like theft, that insurance policy should cover the theft. The simple meaning of the endorsement here has been distorted over time by misinterpretation of Mortel and Hartford, and we believe those cases actually support coverage here. If Vasquez's theft does not fall within the dishonesty rider, it is hard to imagine what would be covered. We hope that the Court, now that it has the opportunity, will correct a fundamental unfairness when it comes to the misinterpretation of the clause at issue and restore common sense and logic by finding that Vasquez's theft from 3BC is indeed covered by the policy and to enter judgment in favor of 3BC. Thank you. Thank you, Counsel. Justice Hutchinson, do you have any questions? Yes, thank you. So, Counsel, are you saying that because Judge Fullerton liked or thought that the Cincinnati case was well decided that he is actually suggesting we should reverse? Is that where you're getting that statement from? I do, Judge. It's not just from footnote 2 on page C753 of the record. He is essentially telling this Court he feels like his hands are tied. He feels like this is not the right result, and I actually think he could have reached the correct results under both Mortel and Hartford for the reasons I described. Mortel and Hartford do not involve any theft. They were deceptive acts, but the work was actually done. The company actually received some benefit. And so I think if you take a really close look at Judge Fullerton's written opinion here, I believe what he's asking this Court to do is reverse it. All right. Some of the cases identified as calling salaries, or covering salaries, rather, or money in salaries often don't really talk about the exclusion as much as they talk about the fact that a theft occurred. Isn't that correct? In some of those cases, yes. I mean, the problem is that most of those cases are not from Illinois and are not precedent, number one. And the other problem with most of those cases is that in those jurisdictions, they don't interpret ambiguities in coverage to be narrowly construed or to be construed in favor of coverage. And that's one of the real problems with all of the out-of-district cases that are cited by the affiliate. All right. And Mortell and Hartford, as you noted, are the cases that the trial court looked to and felt that the principles that we subscribe to require that he follow those. We know that as stare decisis. Why should we not follow those cases? Well, there's a couple important points there. Number one, they're very distinguishable. Again, the most obvious point is that they did not involve theft. And number two, stare decisis is not a fixed idea. It's not something that we are stuck with. If that was the case, you know, Plessy v. Ferguson, which allowed racial discrimination, would still be illegal. Pace v. Alabama would still be the law of the land, which held that it was illegal for whites and blacks to marry. Fred Scott would still be the law of the land. And that's the beauty of the law, is it allows flexibility. It allows us to change over time. It can recognize itself when it's incorrect. An injustice has been done. And what we're talking about here is a dishonesty clause that this company, 3BC, specifically paid for. And so if it doesn't cover theft, then what can it really cover? So, you know, Mortel and Hartford are very different, and stare decisis does not mean that you have to blindly follow those cases. But in Mortel, they were commissions that were earned on illegal securities, correct? They were commodities or securities that were sold deceptively. In other words, they didn't have – and there was very little analysis, by the way. I've read the Mortel decision more times than I care to admit, and there's very little analysis about the rider itself. But what I think was really important about Mortel is what the insurance company lawyer was arguing, which is that if the benefits aren't earned in the normal course of employment, then – if they are earned in the normal course of employment, then there's no coverage. And Vasquez did not earn the money that she stole, period. But the rider is not – or the exclusion is called employee dishonesty. But it does – it does create exclusions. And if you apply it the way you want to, that just theft occurred, and therefore, no matter what form it comes, it's still theft, and it should be covered, what's the purpose of identifying these specific salaries, commissions, bonuses, et cetera? Because those are things, Your Honor, that are actually earned. You can never earn a salary if you stole it, which is what Vasquez did here. So in other words, what State Farm does not want to do, and what all insurance companies don't want to do that have a rider like this, is they don't want a situation where, let's say, a car salesman earns a commission because he sold 10 cars in the month of March. But in order – and he received that commission or that bonus. And in order to sell those 10 cars, he was saying things to his customers about the cars that weren't true. He was saying the warranties were longer than they really were, or the gas mileage was better, whatever. And later, the employer learns, hey, when our sales guy sold those 10 cars during the month, he was lying about the attributes of the vehicle, so we want our commission or his bonus back. So State Farm, give us the $2,000 bonus back. State Farm does not want to get involved in those. But if this employee dishonesty rider doesn't cover outright theft, it was none of these things. It wasn't salary. It wasn't a commission. It wasn't bonus. If it doesn't cover that, then it's illusory because it wouldn't cover anything. Well, Council, what's your definition of embezzlement? Well, I mean, embezzlement to me is any scheme designed to steal money that doesn't belong to you. But then that would include it in the exclusion. It would be money that it could go in your salary, and that's excluded. I guess the question is, let's look at it this way. If you're stealing from the storage cabinet, or you're forging a check that should have been paid to someone else, or you maybe are writing a check for an invoice, but you're putting a couple extra dollars on with the agreement that the person receiving it's going to pay you back or kick back some money. Yes. Those should not occur in the normal course of business, correct? Those things? That's correct. And they could be identified as embezzlement, correct? Correct. But salaries are earned in the normal course of business, even if they have discrepancies, correct? No. I mean, salaries can't be earned if they're stolen. I mean, I have a salary from my law firm, and I'm also the person who's in charge of our finances and our checkbook. I can't write myself secretly a check over my salary and call it salary. And then when my partner's salary, we have employee dishonesty coverage. We shouldn't be barred from coverage in that instance. What Vasquez did was not anything that was earned. She didn't earn that money. She just simply stole it. Okay. In many of the cases that were reversed, there is some question of significant substantial fact that's outstanding. Is there any such significant fact outstanding in this case? Well, yes. I mean, the most significant fact that distinguishes our case from Mortel, which is the only Illinois precedent, and Hartford, the only other Illinois case, is that we are talking about theft specifically. And the only other case in Illinois that involved theft, but it didn't involve the exact same rider, was the Oxford Bank decision, which was issued by Judge Darragh from the 2nd District. And the reasoning there is exactly what we're talking about here, is that when you steal money and you have an employee dishonesty rider, and that money is not earned in any sense of the word, just calling it or designating it salary, commission, bonus by the insurance company that's providing the coverage doesn't make it earned. It doesn't make it salary. It doesn't make it commission. And that's really the biggest distinguishing factor. And that's why I believe Judge Fullerton specifically pointed out the Cincinnati insurance case from the Alabama Supreme Court, because we're talking about the exact same issues, manipulating the payroll system to steal money that was called salary, but it wasn't actually salary because it was above and beyond. That employee's fixed salary. Okay, and finally, is this the only type of fidelity bond that your clients could have purchased, or were there others that were available with different exclusions or no exclusions? Well, you know, that's a good question. I know that when, this is all I know, is that when they had their insurance with State Farms for a while, and when it was time for them to renew, their agent suggested to them that they might want this extension of coverage. And so, you know, unlike the mortality case, this was an extension of coverage for employee dishonesty that they thought, based on their discussions with their agent, made sense to spend additional premiums on to purchase. Okay, so they, this was the one recommended, and this is the one they chose? Correct. With some guarantee from their agent that if somebody stole through salaries, they would, that would still be considered a trigger? Judge, I mean, I could not tell you exactly what transpired between their agent. All I do know, and so I don't know what promises their agent made, all I do know is their agent told them this would be good coverage to have for the kind of work that you have, the kind of stores that you have. Okay. All right. Thank you, Mr. Manske, and thank you, Justice McClure, and I have no other questions at this time. Thank you. Thank you. Justice Bridges, do you have any questions? I do. Thank you, Mr. Manske. Justice Hutchinson covered most of mine, so the one that I want to ask you is, doesn't the plain language of the policy here exclude coverage where the insured dishonesty or dishonest employees would obtain salaries, commission, etc.? No, I don't think so at all. In fact, I think it's excluding coverage for things that you earn. I mean, and that's the real problem here is so many courts have interpreted this language differently that this is the precise ambiguity that I'm talking about. I mean, I read this. My clients, of course, read it. I've had other people read it, and they read that part of the coverage. This is 1A. It says, obtain financial benefit, comma, or I should say parenthesis, other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions, or other employee benefits earned in the normal course of employment. A normal person would read that and say, okay, that makes sense. Employee dishonesty coverage is not going to cover things that the employee earns in the normal course of employment, but this isn't anything that was earned in the normal course of employment. And again, so many different courts have interpreted this differently, at least in Illinois, that requires the court here to interpret the terms that are susceptible to more than one meaning in a way that strictly construes the terms of the endorsement against a farm in its favor of its insured. Mr. Manske, didn't Zelinsky testify in the record C-81 that 3BC was essentially seeking coverage for money that was paid as salaries? Wasn't that his testimony? Well, he wasn't asked to give a definition of the terms as it relates to this insurance policy. He was asked, how did she steal that money? And she stole that money by manipulating the payroll system so it was paid to her as if it was salary. But it wasn't salary because it was stolen. It was above $66,000 above and beyond her salary. So, I mean, just calling it salary when it's not salary doesn't make it excludable. Thank you, Mr. Manske. I have no further questions. Thank you. Thank you. Thank you, Justice Bridges. I have no questions. I may have some questions on rebuttal. Thank you. Okay. Thank you. Yes. Mr. McConnell, you may proceed. Thank you. May it please the court, my name is Kyle McConnell, that is spelled M-C-C-O-N-N-E-L-L, and I am here on behalf of State Farm Fire and Casualty Company. Your Honors, this case revolves around the Illinois decision of Mortel, as you well know by now. The reason that the explanation and reasoning in Mortel was not extensive is because, from our point of view, it's unnecessary. The fact is the exclusion that was in Mortel that is also present in this case clearly delineates categories of benefits that can be dishonestly obtained by an employee but are then excluded by the policy. In fact, there is no court that has been cited who has found the language of the policy to be ambiguous, and that includes the case upon which 3BC relies so heavily, Cincinnati, from the Alabama Supreme Court. Even there, they said the terms and language of this provision are unambiguous, despite the fact that they reached an opposite conclusion. But in Mortel, the fact is that the agents and salespersons obtained commissions via their dishonest acts, and because they obtained those commissions via their dishonest acts, they were found to be excluded under the plain language of the exclusion contained in the policy. Now here, Vasquez also performed dishonest acts. She performed dishonest acts in that she manipulated the hours worked by her and her family members so that they would obtain salaries they would not have received otherwise. So in that respect, Mortel is completely on point, with the only difference being that in Mortel, the employees dishonestly obtained commissions they would not have otherwise received but for those dishonest acts. And here, Ms. Vasquez obtained salaries via dishonest acts that she would not have obtained otherwise but for those dishonest acts. In Hartford, the Hartford case, not only does it discuss Mortel, but it goes even further to explain why it was reaching to the decision that it was. And as it got into the actual plain language of the policy, which it also found to be unambiguous, it looked at the phrase earned in the normal course of employment. And it looked at the way the exclusion was written and indicated that if that phrase were to relate all the way back over several commas to the word commissions, then it would render the phrase meaningless otherwise. And I think that's the crux of this issue. 3BC really emphasizes that this was theft by Ms. Vasquez. However, this is not an insurance provision that covers any form of theft. In fact, the word theft is not present anywhere in the policy provision. And rather, it covers employee dishonesty. And it lays out several factors that must be met in order for it to be covered and then also provides an exclusion that includes these categories of employee benefits and then uses the phrase and other benefits earned in the normal course of employment. Because as the Hartford Court made clear, it cannot just go on ad infinitum naming categories of benefits that might be earned in the normal course of employment. So 3BC wants to indicate that she could not have earned salaries because these salaries were not for work that she performed. But if that's true, then this entire exclusion would be rendered meaningless. In fact, sure, you cannot dishonestly earn a salary. And that's why the contention that 3BC makes in this case is illogical. And it's also the reason why the Cincinnati court was incorrect in the limited reasoning that it offered to support the decision. And the courts around the country that not only cite to Mortell but support the reasoning of Mortell have made clear the faulty logic that's contained in the Cincinnati decision. To 3BC's contention that this provision clearly contemplates bona fide salary disputes rather than employee theft, it simply does not say that. The plain language of the provision says nothing about bona fide salary disputes. So I'm not sure where that's based on, but it simply cannot be written into the policy in order to support their position. Regarding the Oxford Bank case, as we indicated in our brief, the Oxford Bank case did not involve this exclusion at issue. So it is ultimately irrelevant. However, I do believe it's worth noting that in Oxford Bank, the issue was whether a check-kiting scheme was covered by the employee dishonesty provision that was present in the policy at issue there. The fact is that's an example of where this provision would have covered. A check-kiting scheme would have been covered by this provision because that's obtaining benefits other than the enumerated categories within this provision. 3BC makes a contention that if it doesn't cover this type of theft, as they call it, then what would it cover because they contend that it's illusory. But the fact is this would cover forging checks. This would cover unauthorized or fraudulent use of a company credit card. There are many different categories of dishonest acts that would be covered by this provision. It simply excludes amounts that are categorized within the enumerated categories. You know, Mr. Zielinski, 3BC's representative, admitted at deposition that the amounts obtained by Ms. Vasquez were paid out as salaries. Their taxes were paid out of it. It was on the company's system. The only difference is she performed a dishonest tax to increase the amounts that were paid out as salaries, much the same way the salespeople in Wartell dishonestly performed a dishonest tax in order to obtain commissions that they would not have otherwise have received. There really is not a split among the courts on this issue. Not only has no court, including the Cincinnati court, found the term to be ambiguous, but courts across the country are in support of the reasoning of Wartell and have reached the same conclusion. The Fifth Circuit that we cited in our brief concluded that a dishonest employee who gave unauthorized pay raises to herself and another employee is excluded because it's an unauthorized salary due to dishonesty. And if it did not exclude that, then the word salary would become mere surplusage. One of the most on-point cases that we cited in our brief was the Eighth Circuit and the R&J Enterprises case in which a dishonest employee overstated the number of hours he had worked on his time cards. That is exactly what happened here. Ms. Vasquez dishonestly overstated the number of hours that she and her family members had worked on their quote-unquote time cards because in this instance it was an electronic entry. The Eighth Circuit reached the same conclusion as Wartell because they stated that the courts must strive to give each word of meaning that does not render it superfluous. The simple fact here is benefits that are actually earned do not result from dishonest acts. And that is why the Hartford Court as well as the Eighth Circuit has indicated that that phrase at the end, earned in the normal course of employment, does not relate back to salaries because salaries cannot be earned in a dishonest manner. Even Judge Fullerton mentioned in his analysis that the distinction between earned and unearned is irrelevant here because you cannot dishonestly earn a salary. That, by definition, would be unearned. And so, therefore, the application by 3BC of the phrase earned in order to require the salaries to have somehow been worked for or earned by the employee simply does not make sense. And if that were the case, it would render the phrase superfluous. The Sixth Circuit and municipal securities is similar to Wartell and actually cited Wartell's support there. The employee obtained commissions through dishonest acts. Here, again, Ms. Vasquez obtained salaries through dishonest acts. So, you know, going back to the unambiguous provision here, that renders the argument that it must be interpreted against the insurer irrelevant because the simple fact is the term salaries is not ambiguous. The simple fact is dishonest acts were committed in order to obtain salaries, which is a specific category excluded from coverage under this provision. The plaintiffs indicate that a reason we should overturn Wartell is because they feel this was an injustice because the provision should cover theft. But, again, the provision does not mention theft anywhere within it. 3BC has categorized the actions of Ms. Vasquez to constitute theft in an effort to indicate that this provision should include it. But that does not offer them any benefit because the provision not only does not mention theft, but it also specifically outlines the manner in which the provision offers coverage. And, again, that would be, for example, a check-cotting scheme as was in Oxford Bank. That would be fraudulent use of a company credit card. That would be forging checks. All of the monies obtained through those dishonest actions would not fall within the categories that are explicitly enumerated within this provision. And with that, I will rest. Thank you. Justice Hutchinson, do you have any questions? Yes, I do. Thank you. Mr. McConnell, counsel, Mr. Manski, suggested that his reading of Judge Fullerton's memorandum suggests that we should reverse. Do you see anything like that in this memorandum? I think that—I know the phrase that counsel is referring to that was contained in a footnote of Judge Fullerton, and I do not read it as suggesting this court should overturn Mortell. I read it as him feeling that the plaintiffs do—they believe that this was an unfair result based on their reading and interpretation of the provision. But the fact is there is no basis for their interpretation of the provision to provide coverage for these actions because the explicit language of the provision excludes coverage. And I think the reason why that was indicated in a footnote was to provide an acknowledgement of plaintiffs' good-faith basis for wanting this provision to cover this instance. But he also recognized that not only is Mortell binding precedent on him, but he also recognized that other courts have reached the same conclusion. The Texas Appellate Court that we indicated and we cited to in the Dixon case, you know, pointed out that courts strive for uniformity across jurisdictions, especially when the language is identical, and that is the case here. Illinois is currently in line with numerous jurisdictions across the country, excluding the Alabama Supreme Court. And by overturning Mortell here and agreeing with plaintiffs' position, it would create a split jurisdiction where Illinois is the outlier in interpreting this provision. And to the extent that there is injustice here, the fact is insurance companies, including State Farm, has relied on the Mortell decision for over 30 years in drafting the policy language in which that policy language was found to be unambiguous. And so reversing Mortell now would do a great injustice to the Appellees as well. Okay. What, in your opinion, is the real reason that these earned in the normal course of employment benefits are not covered or don't trigger coverage? I think one reason is because the categories that are enumerated in the provision are within the control of the insured to some extent. I want to be clear that I'm not casting blame or pointing the finger at 3BC or the representatives from 3BC. But the bottom line is monies that are paid out to employees via paycheck through the time card system, either as commissions or salaries or bonuses, are within the control of the employer. That is much different from an employee writing on a check a false amount and then attempting to cash it. They cannot control that. And reaches inside and takes money that is not theirs. So I think one of the reasons is because it's a much more above board category in the sense of salaries. The fact is this was all documented and on paper. And as Mr. Zielinski, 3BC's representative, testified to, after this occurred, they simply put into place a policy where if an employee's salary all of a sudden makes a huge bump, then they're notified so they can catch it at the time that it happens. I think that's one of the reasons, but certainly not the only. And are there other fidelity bonds or policies of this nature that you're aware of that do not exclude these specific categories that could have been purchased? Or is this pretty much the custom of the industry? My understanding is this is the custom of the industry. I have not come across a different provision. Not to say that given the complexity of business relationships, one would not be drafted if sought after. But I have not come across an employee dishonesty endorsement that differs in any substantial way from the one that's at issue in this case. And, in fact, this exclusionary clause is pretty common across the vast majority of employee dishonesty endorsements that I've seen. The only possibility that I could reasonably foresee is that this exclusionary clause could be deleted if negotiated when discussing premiums and obtaining the policy. But, of course, that's speculation. Lastly, we state court judges always talk about the fact that federal courts don't particularly like us. They think we're not as smart as they are. And, therefore, we don't follow some of their decisions. And none of them are binding, correct? That's correct. In all of these federal court cases, they were interpreting either state court or diversity jurisdiction cases in accordance with the states that were within their circuit. But the interesting thing is they actually cited Mortel in more than one of the cases that you're talking about, correct? Yes, they did. I think maybe part of that is because this exclusion was relatively new prior to Mortel and, in fact, was written by the insurance industry in order to make it unambiguous. So I think Mortel was one of the first decisions to interpret this under a factual pattern that's similar to this. So the other courts were looking for supporting precedent. Again, I recognize that's speculation. But I think that Mortel was one of the first decisions to interpret this exclusion. And in reaching their own conclusion, they pointed to Mortel for the logical reasoning that it offered in relying upon it. All right. Thank you very much, counsel. And thank you, Justice McClure. And I have finished my questioning at this time. Thank you, Justice Hutchinson.  I do. Thank you, Justice. Mr. McConnell, the Eighth Circuit and R&J Enterprise case reasoned that an employee who forges a check to acquire funds would be covered under this provision. How is that different than forging time cards? It's different because the check that would be forged would be in the possession of the employee. It would be taken to a bank and then cashed for their own benefit. At no point between the point of possessing the check and the check being cashed would the employer have any oversight of that process. Here, Ms. Vasquez was not the one that was writing the paychecks. Her job duty, as testified to by Mr. Zielinski, was to input the hours into the payroll system. That payroll system then, you know, did the appropriate calculations. The checks were gone out. And in fact, their accountant, Mr. Zielinski, and his partner had access to this system that Ms. Vasquez was putting these numbers into. So I think that's the biggest differentiating factor between forging checks and the fact pattern that we're presented with here. Okay. And the Avalon Cites, the Cincinnati insurance case that basically held the same dishonesty rider, covered thefts where employees enhanced their own paycheck. How would you distinguish that from this case? I'm sorry. I didn't catch the quote that you said initially. The Cincinnati insurance case. Correct. And you said which court cited Cincinnati? No, the Avalon and the brief. I apologize. Yeah. Yes. I think the biggest, the critical error that the Cincinnati court made in reaching its conclusion is there's a phrase that the Cincinnati court says, what the insurance company would have us do is rewrite the policy to say that any amounts designated as salaries are excluded. That's the crux of their reasoning. And I disagree with that. And other courts have disagreed with the Cincinnati decision because amounts designated as salaries are, in fact, salaries. And the term salaries is used in the provision. So the fact that this term salaries is used would include amounts designated as salaries. And I think that's the critical error that the Cincinnati court made. And they didn't offer any other reasoning to support their conclusion. It was a fairly brief decision, actually. And there were logical errors, including that one, that the other courts that have disagreed with Cincinnati and actually agreed with Mortel have all opined upon. Okay. So but how are these overpayments that were made to the Vasquez considered earned in the normal course of employment? Tom, explain that to me. Yes. The amounts that Vasquez received were not earned because the work was not performed in order to earn them. And that is why the Hartford decision was prescient in pointing out that the phrase earned in the normal course of employment cannot possibly modify the word salary or, in that case, commissions because it would be rendered superfluous. You cannot dishonestly earn a salary. The fact that it was dishonest means that the salary was not earned. And that's why there is no distinction between earned and unearned, as Judge Fullerton points out, as well as many other cases, because otherwise it would be rendered superfluous. Thank you, Mr. McConnell. Justice Garner, I have no further questions. Thank you. Justice Bridges. Counsel, does it make any difference whether it's a salary or whether it's an hourly wage? No, it does not.  Well, salary comes from the word salarium, which was the allotment that the Roman soldiers were given on an annual or a monthly basis as their salt supply. And it was given to them regardless of whether they sat on their hands or fought sagoths or vandals. And so a salary is an amount of compensation that's paid whether you work or not. Whereas an hourly wage is based upon hours. So my question to you is, does it make any difference between a salary and earned wages or hourly wages? It does not. And the reason why is because with hourly wages, you are still, yes, you're being paid for the time spent. But there is an expectation that that time spent will be spent performing your job duties if needed. I think with salary, it's expected that you're going to perform your job duties for the compensation that's agreed upon. And with hourly wages, there's an expectation you're going to perform your job duties with the understanding you will be compensated for the hours spent doing so. So whereas your correct salaries could represent a possibility that employee does nothing, so does hourly wages. You'll still be paid for that time, but you weren't holding up your end of the bargain by performing your job duties during the time that you're being paid for. And that's why I believe that's a distinction without a difference as it relates to this fact pattern in this case. Well, the fact pattern in this case was not salaries. It was hourly wages, was it not? It was. Okay. I have no further questions. Justice Hutchinson, do you have any questions? No, thank you. Thank you. Justice Bridges, do you have any further questions? Do not. Thank you. Judge McLaren, can I follow up on that question you asked? Sure. The only other thing I would add is to the extent you do draw a distinction between salaries and hourly wages, I believe the hourly wages would be covered by the other employee benefits earned in the normal course of employment, which was the entire purpose of that phrase was because they could not possibly anticipate the numerous number of categories of financial benefits that are earned by employees. Okay. Thank you. Thank you. I believe you're done, and we're now going to go back and listen to appellate counsel's five-minute rebuttal. And I don't think I heard the buzzer, even though I thought that one or both of you may have gone over ten minutes. Am I incorrect about that? Judge, they were just about to be buzzed. Okay. Very good. Thank you. Mr. Manske, you may proceed. Sure. Thank you, Your Honor. I can make this brief, and I just want to take through a few things here. Counsel argued that the Alabama Supreme Court decision in Cincinnati stands alone. It doesn't. There are numerous cases cited around the country that support the position that we're taking related to this employee dishonesty rider. And those are not only cited in our papers, but they're also, I believe, at least some of them are cited in Judge Fullerton's opinion as well. You know, on this issue of the definition, you know, if you go back to Mortell and Hartford, I mean, those cases that started what I believe is a misinterpretation of this rider, The Hartford lawyer, or I should say the Mortell lawyer for INA, was arguing that this should not cover salary or benefits that are earned in the normal course of business. That's exactly what did not happen here. Ms. Vasquez did not earn fees in the normal course of business. If we called her the money that she took, wages instead of salary, the word wages doesn't appear in this employee dishonesty rider. So just classifying it as salary when it was not salary, it was just money stolen, doesn't make it excludable. The Hartford court specifically stated that the term earned in the normal course of employment was included to provide coverage for losses resulting from, quote, compensation schemes that are generally unearned, such as payoffs, embezzlements, and other forms of theft. That's precisely what we have here. We're not talking about a salary that she earned, and then there's some dispute between 3BC and her as to whether or not they should have paid her a little bit less for the work she did, or she believes she should have been paid a little bit more. That's not what we're talking about. We're not talking about something that was earned. We're talking about something that was dishonestly taken from this company. And I think, again, the most important part about some of those decisions that interpret this rider is not covering money that is classified as salary or a commission or a bonus, is that in those jurisdictions, they do not have the fallback position that we have in Illinois, which is that if the policy language is susceptible to more than one reasonable meeting, the court must strictly construe those terms against the insurer. And I disagree completely with counsel that there is no ambiguity here. I mean, this rider has been the subject of at least a dozen or more cases precisely because of the ambiguity in the language. And when there is an ambiguity in that language, it needs to be strictly construed against a firm and in favor of its insured 3BC. And that's all I have. Thank you. Justice Hutchinson, do you have any questions? Yes, thank you. Well, Mr. Manske, I understand that last argument you made that we have inconsistent decisions, and therefore there must be an ambiguity. I can't even say it, but there must be one. But yet none of the courts who've decided it have said it's ambiguous. So how do we, you know, deal with that? Well, I think the common sense way to deal with it is to look at this language. I mean, is it ambiguous? And I believe the answer is yes because it's open to more than one interpretation. That's the basic definition of ambiguity. I mean, even Judge Forten acknowledged that there are different interpretations of the same language. So I would say that in and of itself is the definition of ambiguity. When an ordinary person reads that they will have coverage for employing dishonesty, other than salaries, commissions, fees, bonuses, and benefits earned in the normal course of employment, I submit to the court that an ordinary person will read that and say, okay, so if something is earned in the normal course of employment, I obviously can't ask the insurance company to pay me back for it. If I pay that salesman that bonus for selling those 10 cars last month because he sold the 10 cars, I can't go to the insurance company and say, hey, I want you to pay me that bonus. And so I think the ambiguity is right here on the written page, and those courts that have been discussing it prove that. All right, but if there are inconsistent findings, and there are some outliers, and then there is what would be known as the majority in our parlance, just because they are inconsistent doesn't necessarily mean it's ambiguous. It could also mean that the reasoning or the interpretation by one of the parties is not reasonable to the circumstances and the industry. Isn't that also correct? I think that that's also correct when you're – I believe that's correct when you're dealing with an issue that does not involve outright theft, which is what we have. All right, and lastly, strictly construed against the insurer. I mean, that's what we all – that's the catchphrase we all use. But the Texas court, or the Texas circuit, the fifth I think it was, said, unearned salaries and commissions are nevertheless still salaries and commissions, and therefore belong to the generic category of employee benefits that are normally earned in the course of employment. That's that performance autoplex. Isn't that strictly construing against the insured – insurer, pardon me? Well, no. I mean, I think that's strictly construing that phrase against the insured, because the term salary implies that that money was earned. I mean, and so to say that salary includes money that's earned or unearned I believe is just a mistake. It's not accurate. But that's a mistake. I'm sorry, go ahead. But that's a mistake then made by most of the cases that have decided against you, correct? Yes. And the northern district in Hartford has said the opposite. Okay. Thank you. And at time, for all intents and purposes, this oral argument is complete and terminated. Thank you. Thank you very much. Appreciate it. Thank you.